**512**

INDEPENDENT INVESTOR PROTEC-
TIVE LEAGUE et al., Plaintiffs,

v.

TELEPROMPTER CORP. et
al., Defendants.

No. 73 Civ. 4133.

United States District Court,
S. D. New York.

Jan. 9, 1979.

I. Walton Bader, New York City, for
plaintiffs.

Rosenman, Colin, Freund, Lewis & Cohen
by Lawrence R. Eno, New York City, for
Touche Ross & Co.

## OPINION AND ORDER

OWEN, District Judge.

This motion to impose sanctions raises
two serious questions: (1) whether the at-
torney for the plaintiffs mailed copies of
purported clients' answers to interrogato-
ries to an adversary on the last day permit-
ted by a court order without in fact having
any originals of such answers in hand from
any client or any awareness of their exist-
ence, and (2) whether the attorney thereaft-
er made false statements to counsel and the
Court and gave false testimony as to the
foregoing.

Defendant Touche Ross & Co. ("Touche
Ross") has moved for the imposition of
sanctions against plaintiffs, the Indepen-
dent Investor Protective League ("IIPL"),
Martin F. Randolph, Jr. ("Randolph"), Gary
Michael ("Michael"), Michael Fagan ("Fa-
gan") and their counsel, I. Walton Bader,
pursuant to Rule 37(d) of the Fed.R.Civ.P.
Sanctions are sought by virtue of circum-
stances disclosed in hearings held before me
relating to the service on September 5, 1974
of copies of purported answers of plaintiffs
to Touche Ross' Interrogatories dated No-
vember 1, 1973.

Touche Ross charges that plaintiffs and
their counsel conspired to mislead Touche

Ross into believing that the original answers to the November 1, 1973 Interrogatories had been received from plaintiffs Randolph, Michael and Fagan on September 5, 1974, prior to service of the copies when in fact they had not been received, and plaintiffs' counsel had no awareness even of their existence.

It is further charged by defendant Touche Ross that when, on September 11, 1974, it was disclosed that the original answer of Michael and Fagan had *not* been received on September 5, 1975, plaintiff IIPL and Mr. Bader misled Touche Ross and the Court into believing that the original answers of Randolph had been received on September 5, 1975, when they had not been, and further that unconformed copies of the proposed answers of Michael and Fagan had been served "inadvertently" by someone other than Mr. Bader.

As this motion involved serious allegations, I held hearings on November 9, 13 and 14, 1974. I find the following facts.

### The Events Prior To September 6, 1974:

In February 1974, I held a status conference in this action. At that time, it was disclosed to me that answers to certain interrogatories propounded by Touche Ross dated November 1, 1973, were long overdue. I therefore orally directed Mr. Bader, counsel to plaintiff, to promptly answer those interrogatories.

Apparently nothing happened and six months later, on August 16, 1974, I granted a written motion by Touche Ross to compel each of the plaintiffs to respond to the interrogatories and directed that the order be complied with within 20 days, the 20th day being September 5, 1974, a Thursday.

### The Events of Friday, September 6, 1974:

On September 6, under postmark of September 5, Mr. Eno, a partner in the firm of Rosenman, Colin, Kaye, Petschek, Freund & Emil (the "Rosenman firm"), representing defendant Touche Ross, received in the mail a copy of purported answers of IIPL.[1] In a separate enclosure, also under postmark of September 5, copies of purported answers of individual plaintiffs Randolph, Fagan and Michael were received.[2] All of these copies were unconformed, except that the IIPL answers had written in, in the verification, the words, "s/Merrill Sands." Sands was the controlling officer of IIPL.

Mr. Eno that day mailed a letter to Mr. Bader requesting that the originals of the several answers be immediately filed pursuant to Rule 6(c) of the General Rules of this Court. The letter noted the failure to conform the copies of the several answers and requested information regarding the same, including whether they had actually been signed and sworn to by the several plaintiffs.

### The Events of Monday, September 9, 1974:

On Monday, September 9, at 9:15 A.M., Ms. Rosen, a receptionist in the Rosenman office, received a telephone message from Mr. Bader for Mr. Eno stating:

"Rec'd your letter about Teleprompter case. Will send you photocopies of original Interrogatory answers within next few days."

At 10:37 A.M., Mr. Bader called Mr. Eno again; Mr. Eno was not available to take the call, and Mr. Bader could not be reached when Mr. Eno returned the call.

Thereupon, Mr. Eno hand-delivered a letter to Mr. Bader. That letter stated:

"Dear Mr. Bader:

We today received a telephone message from you in response to my letters of September 6 and 7 in which you say that you will send us copies of the original Interrogatory answers 'within the next few days.' This is unsatisfactory to us.

---

1. The copy of the answers of IIPL bore the typed date September 5, 1974.

2. The copies of the answers of Randolph, Fagan and Michael each bore the typed date, August 29, 1974. These three plaintiffs lived in states other than New York and Mr. Bader apparently had prepared and mailed the proposed answers to each to consider, execute if appropriate, and return.

Mr. Nevling is prepared to come to your office immediately to inspect the originals, if they have not already been filed. If that opportunity is not afforded by the end of today or the originals are not filed by the end of today pursuant to Rule 6(c) of the General Rules of the Court, we shall assume that you do not have the originals and did not have them on September 5, 1974, and shall proceed accordingly."

### The Events of Tuesday, September 10, 1974:

On Tuesday, September 10, at 9:25 A.M., Mr. Eno's secretary received a telephone call from Mr. Bader, and typed up his message as follows:

"Mr. Bader called. Re Interrogatories. He will be sending photocopies of original answers. He extends his apologies. He will extend your time to answer for 2½ or 3 weeks." [3]

About 10:30 A.M., Mr. Eno called Mr. Bader, and was told that he was unavailable. Mr. Eno then told Mr. Bader's secretary to have him call Mr. Eno as a matter of urgency, and that if Mr. Eno did not hear from Mr. Bader, he intended to communicate with the Court. Mr. Bader's secretary said that she would try to reach him. Thereafter, Mr. Bader's secretary called Mr. Eno back and stated that she had been unsuccessful in reaching Mr. Bader and asked Mr. Eno to wait until 1:00 P.M. before calling the Court, to which Mr. Eno agreed. Mr. Bader called Mr. Eno at about

12:30 P.M. Mr. Eno told him he was not satisfied with the messages that he had been receiving and that he wanted to see the original answers of all the plaintiffs immediately. Mr. Bader said that Mr. Eno had a right to see them but that he was busy on a deposition and could not show them immediately, but would in a few days. Mr. Eno insisted on seeing them that day and told Mr. Bader that he did not believe that Mr. Bader had the originals. Mr. Bader then stated, "I have them. You can take my word for it." Mr. Eno said that he or Mr. Nevling would meet Mr. Bader in his office later that day after the deposition. Mr. Bader said that was not possible because he did not know where in his office the originals were and he might have left them at home. Mr. Eno said that he would then meet Mr. Bader in his office at 9:00 A.M. the next morning, to which Mr. Bader agreed.[4] Mr. Eno thereupon sent to Mr. Bader by hand the following letter:

"Dear Mr. Bader:

This will confirm your statement to me that at 9:00 A.M. tomorrow in your office you will exhibit to Mr. Nevling of our office the originals of the purported further answers of plaintiffs Michael F. Randolph, Jr., Gary Michael and Michael Fagan, as well as the original further answers of IIPL."

### The Events of Wednesday, September 11, 1974:

Early on the morning of September 11, Mr. Nevling went to Mr. Bader's office

---

**3.** Mr. Bader does not dispute this message, except that he recalled saying "copies" rather than "photocopies."

**4.** Mr. Bader, in testimony before me, at first did not recall this conversation at all:

Q. You don't recall your conversation with me on September 10th when your secretary told you that you had better get in touch with me and you say you called me from the offices of White & Case? Do you remember that?

A. I say I may have spoken to you, Mr. Eno. I don't recall the conversation.

Q. You don't recall the conversation?

A. No, sir.

Q. At all? You have no recollection of that conversation?

A. No, sir.

Later, his recollection was in part refreshed and he testified:

Q. Did I answer you by saying I didn't want to take your word for it, I wanted to see them? Does that refresh your recollection at all?

A. I believe you said something like that, yes, sir.

Q. And did you—

A. And I said I couldn't do it that day because I was tied up in depositions, it was late and I couldn't get back to the office, I didn't know where the originals were, I hadn't been in the office for several days, but if you came in bright and early the next morning I would be very happy to show them to you.

where he was shown the original answers of IIPL by Mr. Bader. They were dated September 5, 1974 and purportedly were sworn to on September 5, by Merrill R. Sands, as Secretary of IIPL, in New York County. Mr. Bader was the notary who took Sands' signature and the answers were also signed by Mr. Bader. Mr. Bader also exhibited the original answer of Randolph dated August 29, 1974 and purportedly sworn to on September 3, 1974 by Randolph in California; and the answers were also signed by Mr. Bader.

When Mr. Nevling asked for the answers of Fagan and Michael, Mr. Bader said that he could explain, and gave Mr. Nevling his affirmation dated September 11, 1974 which Mr. Bader had drawn to support a motion for extension of time to answer. The affirmation merely stated that the answers of Fagan and Michael had not yet been received.[5]

Later that day, Mr. Eno sent a hand-delivered letter to the Court, with a copy to Mr. Bader. In that letter, Mr. Eno noted, among other things, that in his conversation with Mr. Bader the day before (September 10) Mr. Bader had assured Mr. Eno that he had the originals but that he did not know where the originals were in his office and that he might have left them at home.

Subsequently that day, Mr. Bader also sent a letter to the Court, with a copy to Mr. Eno. Therein he stated among other things:

On September 5, he had Sands sign the IIPL answers and he, Bader, "instructed My Secretary to send copies . . . to all attorneys. . . ." [6] and that he, Mr. Bader, inspected those copies before they went out and they were "properly conformed."

In the afternoon of September 5, he had to leave his office for St. Louis, but before he left the office, Mr. Bader "prepared" copies of the answers which he intended to conform and mail when he returned from St. Louis.[7] "By inadvertence" on that day (September 5) "apparently" a set of the unconformed answers had been sent to the Rosenman firm. Further, on September 5 he was told during his absence from his office that "Randolph's answers" had arrived.

On September 9, again while he was out of the office, he was told about the receipt of Mr. Eno's letter of September 6 but did not know its contents. Believing that the Rosenman letter of September 6 referred to the answers of Randolph, Fagan and Michael, he called the Rosenman office on September 9 and 10, and the messages he left were to the effect that he "hoped to receive the signed copies of the original documents in a few days." [8] That it was not until about 6:00 P.M. on September 11, when he arrived in his

---

5. That affirmation said nothing about copies of any answers being "inadvertently" sent to the Rosenman firm.

6. His secretary, one Dorothy Blacker, later testified that she did not mail out anything at all, and contradicted Mr. Bader's statement about any instructions to send copies.
    Q. Your testimony is that after you typed those Exhibits A, C, D and E [the answers to interrogatories] you had no conversation with Mr. Bader about those documents at all, is that correct?
    A. Correct.
    Q. Did he ever tell you that you should be on the alert to look for a letter coming from the people to whom you mailed the originals, that is, C, D, and E?
    A. No.
    Similarly, Mr. Sands, who later testified that it was *he* who mailed the unconformed answers, also testified that Mr. Bader had *not*

instructed him to mail any answers out (see Fn. 10, *infra*).

7. It should be noted that (a) these would in any event therefore have been late under the Court's order and (b) Mr. Bader did not in fact go to St. Louis on September 5. He later testified to having worked in the library of the New York Law Institute for several hours that afternoon so that he "missed his plane" to St. Louis, went home to Scarsdale and went the next morning.

8. Mr. Bader's testimony on this subject is set forth in Fn. 4 *supra*. This September 11 letter obviously differs from Mr. Bader's telephone message to Mr. Eno's secretary the prior day, September 10 (p. 514, *supra*), the essential accuracy of which he did not dispute (see Fn. 3 *supra*).

office, that he "for the first time" realized what had happened.

### Events Subsequent To
### September 11, 1974:

Apparently, on September 17, 1974, Sands, Bader's client, executed an affidavit in which he stated that he was the one who had "inadvertently" mailed the unconformed copies of the Randolph, Fagan and Michael answers on a visit to Mr. Bader's office late in the day on September 5;[9] that prior to mailing them he had seen Randolph's answers "which had arrived late in the day at Mr. Bader's office and I then assumed that I could send out the copies thereof."

On September 20, Mr. Bader addressed the Court on this matter on the argument of Touche Ross' motion to dismiss. At that time he made the following statements:

1. That he left his office on September 5 at about 3:00 P.M.

2. That Sands was with him when he left the office, and he told Sands that if the answers of the other plaintiffs came in he should mail out the copies.[10]

3. That *after* he left (at about 3:00 P.M.) Randolph's answers came in in the mail and that Sands had inadvertently mailed out *all* the answers instead of just Randolph's.

4. That Randolph's answers had come in in the 3:00 o'clock mail on September 5.[11]

5. That he did not recall when he first learned that the unconformed copies had been sent, but he knew that when he spoke with Mr. Eno on September 10.

Mr. Bader testified during the hearings held on November 4, 13, 14, 1974. At that time his final version of the facts was that Sands signed the original answers of IIPL in Mr. Bader's office between 8:30–9:30 A.M. on Thursday, September 5; that copies of those answers were put in envelopes, labels were put on the envelopes, Sands took the envelopes to mail and immediately left the office.[12] Sands then testified that by arrangement, later in the day, after Bader and his secretary had both left, he went back to Bader's office. It was empty. He saw that Randolph's answer had come in in the late mail. He waited, and Bader telephoned from the library of the New York Law Institute, and, as he testified:

I got a telephone call on 61, [Bader] called in at four, quarter after four, some time a little after four it was. And I said, you don't have to worry, the Teleprompter answers are here. He said fine, good. I said, go, have a good trip now. He said, good. That's it. Hung up.

Based on that conversation, which was devoid of any authority, Sands, the client, who had not been told by anyone to mail anything,[13] allegedly took it upon himself,

**9.** It should be noted that in October 1974, before the hearing, Mr. Bader wrote the Court a letter expressing concern at possibly not being able to have Mr. Sands' testimony to support the foregoing. This "problem" did not materialize and on the hearing it was revealed that Sands was Bader's brother-in-law.

**10.** Sands, however, testified (1) that he spent the middle of the day downtown in New York City and came back to the office later after both Bader and his secretary had left; and (2) that Bader had not instructed him to mail out anything. See Fn. p. 516, *infra.*

**11.** Mr. Bader testified later that the last mail normally came in at 3:30 P.M. However, records of the U.S. Post Office revealed that the last mail carrier to Mr. Bader's office on September 5 had finished his deliveries and had returned to the post office by 2:07 P.M. The time of his last delivery to Mr. Bader's building, therefore, was 1:30 to 1:45 P.M.

**12.** The Interrogatories bear the typewritten date, September 5. Mrs. Blacker, who typed the Interrogatories, testified that she came to work at perhaps 10:20 and never saw Mr. Sands. She testified that she dates papers the day she types them and remembers no instructions otherwise as to these Interrogatories. I credit this testimony. The question therefore arises: if she typed the Interrogatories *after* her arrival on September 5, what of the Bader and Sands testimony that Sands signed and Bader notarized it and Sands took it away to mail *before* her arrival that day?

**13.** Sands testimony was as follows:
Q. And he [Bader] didn't tell you to mail them?

without notifying Bader, to take the envelopes from his lawyer's desk containing the unconformed copies of *all* the sets of answers of Interrogatories and mail them out, thus "inadvertently" causing the whole problem.[14] I reject this concocted story as I reject Mr. Bader's explanation that he was so busy that he never got to his office for the next several days to "learn" what had happened.

Rule 37 of Fed.R.Civ.P. provides that if a party fails to serve answers to interrogatories (particularly after a court order providing therefor) the court may dismiss the action and, in addition, require the party failing to act or the attorney for said party, or both, to pay the reasonable expenses, including attorneys' fees caused by the said failure to act, unless the court finds that the failure was "substantially justified or that other circumstances make an award of expenses unjust."

On the entire record before me, it is clear and I cannot but conclude that Mr. Bader intended the Rosenman firm to believe that the various answers to interrogatories were due and timely served in accordance with the Court's order on the very last day for such service, September 5, 1974, when in fact they had not been. I also cannot but conclude that thereafter Messrs. Bader and Sands[15] made false statements and gave false testimony pursuant to an evolving plan to first deceive counsel and later the Court as to the circumstances surrounding the mailing of the purported "answers" to interrogatories on behalf of plaintiffs Independent Investor Protective League and Fagan, Michael and Randolph on September 5, 1974. Mr. Bader flatly conceded to Mr. Nevling on September 11 (and later to the Court) that the Fagan and Michael original answers had never been received.[16] Given Mr. Bader's story of leaving his office on September 5 at 3:00 P.M. (although subsequently changed) and the Post Office proof of the last delivery being before 2:00 P.M. on that day, obviously, the Randolph answers were not received by his office in the "late" or any other mail on September 5, the last day for service. They could only have arrived on a subsequent day. As to the answers of IIPL, I credit Mrs. Blacker's testimony from which I conclude that the IIPL answers dated September 5 were typed on that day at some point between

A. No, he didn't tell me to mail them.
Q. What induced you to mail them?
A. Because that's one of the reasons I went to his office in the morning was to sign so that my thing should be mailed out so I figured those had to go out.
Q. You had him on the telephone, he was on the telephone?
A. Right.
Q. Important matter. You didn't say to him, "Should I mail them out?"
A. No, I didn't.
Q. You didn't. And he didn't say to you, "Mail them out?"
A. He didn't tell me to mail them.
Bader's testimony was to like effect:
The Court: Mr. Bader, at 4:15, as far as you knew the three carbon copies were sitting on your desk?
The Witness: Yes, sir.
The Court: And that was the last day to mail?
The Witness: Yes, sir.
The Court: And you did not tell Mr. Sands, now you can conform them and mail them?
The Witness: No, sir.

14. Significantly, although Mr. Bader by September 11 was aware of the fact (1) that the Rosenman firm had raised serious questions with the Court as to a deception on his part,

and that (2) certain papers *had* been mailed by *someone* from his office giving substance to these contentions, it was not until September 15, four days later, that, according to his brother-in-law Sands, he first spoke to him about the incident, and even more time elapsed according to his secretary before he spoke to her about the matter. The inference one feels compelled to draw is that since Mr. Bader knew that he himself had sent out the unconformed copies on September 5 without having secured the originals, the conversations with Sands and his secretary coming so much later were "window dressing" for the court hearing that was foreshadowed.

15. It is reasonably clear that Mr. Bader did not bring Mr. Sands into the picture as the "unknown mailer" until some time after his [Bader's] September 11 letter to the Court since in that letter he indicated that his secretary had mailed the copies in question. (See pp. 515–516, *supra*.)

16. This September 11 admission is squarely in conflict with his undisputed earlier phone messages to Mr. Eno's secretary on September 9 and 10. (See Fn. 3 *supra*.)

10:20 A.M. and 3:00 or 3:15 P.M. Given this, the testimony of Messrs. Bader and Sands to the effect that the IIPL answers were signed and notarized around 9:30 that morning is necessarily false. There being no credible evidence as to when these answers were thereafter, in fact, executed, I am unable to conclude that they were timely executed and served. I therefore dismiss the entire action as to Touche Ross with prejudice.[17]

Given the conduct of Messrs. Bader and Sands, I determine that plaintiff Independent Investor Protective League and attorney I. Walton Bader shall pay to the defendant Touche Ross & Co. the actual expenses, including attorneys' fees, incurred by Touche Ross commencing with September 6, 1974, occasioned by this conduct. To that end, the attorneys for Touche Ross are to submit within 30 days in affidavit form a statement of such services rendered for the period commencing September 6, 1974, to which plaintiff IIPL and I. Walton Bader may respond, so that I may reach an appropriate conclusion on this issue.

The foregoing is so ordered.

While it is not germane to a determination of the motion of Touche Ross, it is not inappropriate to observe that conduct such as that engaged in by plaintiffs' counsel herein cannot and will not be countenanced by the Court. I am, therefore, referring this record for further consideration pursuant to Rule 5(f) of the General Rules of this Court providing for the disciplining of attorneys.

---

**17.** At some point during the pendency of this motion, voluntary discontinuances were filed on behalf of the individual plaintiffs.